IN THE COURT OF APPEALS OF TENNESSEE
AT NASHVILLE
Assigned on Briefs March 4, 2014

In RE ALEXANDER J. G.[1]

**Appeal from the Juvenile Court for Montgomery County**
**No. TPCV125144     Kenneth R. Goble, Judge**

---

**No. M2013-02210-COA-R3-PT - Filed May 6, 2014**

---

In this termination of parental rights case, Mother appeals the trial court's determination that she abandoned her son by failing to support him and that termination was in the child's best interest. Finding clear and convincing evidence in support of the trial court's determinations, we affirm the trial court.

**Tenn. R. App. P. 3 Appeal as of Right; Judgment of the Circuit Court Affirmed**

ANDY D. BENNETT, J., delivered the opinion of the court, in which PATRICIA J. COTTRELL, M.S., P.J., and RICHARD H. DINKINS, J., joined.

Hillary T. Monroe, Clarksville, Tennessee, for the appellant, Jennifer Loraine G.

Robert E. Cooper, Jr., Attorney General and Reporter, and Kathryn A. Baker, Assistant Attorney General; for the appellee, State of Tennessee, Department of Children's Services.

**OPINION**

FACTUAL AND PROCEDURAL HISTORY

Alexander J. G. ("Alex") is the biological son of Jennifer Loraine G. ("Mother") and the adopted son of Blake G. In 2009, Mother and Blake G. divorced. On September 3, 2010, Alex entered the protective custody of the Department of Children's Services ("DCS") due

---

[1] This Court has a policy of protecting the identity of children in parental termination cases by initializing the last names of the parties.

to allegations of abuse by Blake G.[2] Alex has continuously remained in foster care since that time.

Although Alex was originally removed from the home due to allegations of physical abuse, Alex later disclosed that Mother had been sexually abusive toward him. On February 14, 2011, a psychological evaluation was conducted on Alex to determine his mental health needs and to aid in treatment planning. The psychologist who evaluated Alex stated in her report, "Much evidence exists for sexual abuse by mother both behaviorally and in disclosures. Alex has symptoms consistent with sexual abuse." Because of the alleged abuse Alex has suffered, as well as the behavioral issues he exhibited while in foster care, Alex has special needs and requires therapy.

In June 2011, a permanency plan was created, which Mother signed. This plan required, *inter alia*, that Mother maintain contact with Alex, attend all hearings and meetings related to Alex's custody and permanency, and demonstrate her ability to provide safe and stable housing for him. A second permanency plan was created in February 2012 and ratified on April 19, 2012. This plan required Mother to maintain contact with Alex and to financially support Alex by paying child support "as ordered by the Court of Merrick County Nebraska[3] (i.e., $525.00 per month for two children or $362 monthly for one child)."[4]

On July 18, 2011, Mother moved to Idaho. While in Idaho, Mother completed some

---

[2] Blake G. surrendered his parental rights on December 20, 2012, and he is not a party to this appeal.

[3] Apparently, Mother and Blake G.'s divorce became final while Mother was residing in Nebraska. DCS caseworker Michael Spring testified regarding a Nebraska child support order as follows:

Q. Now, were there any specifics given to Ms. Glynn regarding her financial obligation?
A. From - - from what I remember we spoke about - - there was a - - early on in the case, there was some court ordered payments that were to be made, and so we just asked that the intent of that court document be followed. And that is why that financial goal was added to that, because there was a - - court document from her previous marriage that she was to pay the child support, and I believe it was to Mr. Blake G.
Q. Okay. Are you referring to something that was pursuant to their divorce in Nebraska?
A. Correct.

Neither the final divorce decree nor the child support order appear in the record.

[4] This plan was not signed by Mother.

2

action steps as outlined in the permanency plans.[5] In January 2012, Mother began receiving approximately $2,700 per month in disability benefits. Mother testified that, in July 2012, she became romantically involved with a man who became abusive and threatened to kill her. Mother testified that she was essentially in hiding from October 2012 through December 2012. According to Mother's testimony, from August 2012 to December 2012, she had a "couple of phone call[s]" with Alex but the last time she had seen him in person was in April 2012.

On October 30, 2012, DCS caseworker Michael Spring contacted Mother and reviewed an October 2012 permanency plan with her. Mother participated in the discussion of this plan by telephone, and the plan was read "verbatim" to her. The plan required Mother to, among other things, "pay child support as ordered by the Court of Merrick County Nebraska." The plan included the payment address for the central child support receiving unit and was signed by Mother "by phone."

On December 13, 2012, DCS filed a petition to terminate Mother's parental rights based on abandonment of the child by her willful failure to visit and pay support, pursuant to Tenn. Code Ann. § 36-1-113(g)(1) and Tenn. Code Ann. § 36-1-102(1)(A)(i). The termination hearing took place on July 11, 2013 and, by order entered August 29, 2013, the court terminated Mother's parental rights on the ground of abandonment by failure to support and found that termination was in Alex's best interest.[6] Specifically, the court stated:

> The Court finds that [Mother] abandoned [Alex] by failure to support in the four months preceding the filing [of] the petition, specifically August 13, 2012 through December 13, 2012. In fact, [Mother] never supported [Alex] after he entered foster care. As it relates to failure to support, the Court does find by clear and convincing evidence that [Mother] failed to support, which is significant given the fact that she does, and has since January of 2012, received a pretty respectable income pursuant to her disability. And from her own testimony, her expenses, which she didn't include food but – or clothing, but her expenses, by the Court[']s total come to $1,070, so even if you added food and clothing, there was certainly money left over to send to help support this child. The Court finds that she was on notice on at least one occasion,

---

[5] Mother received a certificate of attendance for Stewards of Children Training in November 2011. In February 2012, Mother completed a diagnostic evaluation.

[6] The court declined to terminate Mother's rights based on her willful failure to visit because Mother testified to participating in "a couple of" supervised phone calls with Alex during the four month period prior to the filing of the petition to terminate her rights.

probably two, in addition to the implicit knowledge that she had a duty and an affirmative duty to support this child financially and emotionally and willfully failed to do so by clear and convincing evidence.

Mother appeals the grounds for termination and the trial court's finding that termination was in Alex's best interest.

STANDARD OF REVIEW

A parent has a fundamental right to the care, custody, and control of his or her child. *Stanley v. Illinois*, 405 U.S. 645, 651 (1972); *Nash-Putnam v. McCloud*, 921 S.W.2d 170, 174 (Tenn. 1996). Thus, the state may interfere with parental rights only if there is a compelling state interest. *Nash-Putnam*, 921 S.W.2d at 174-75 (citing *Santosky v. Kramer*, 455 U.S. 745 (1982)). Pursuant to Tennessee Code Annotated section 36-1-113(l)(1), "[a]n order terminating parental rights shall have the effect of severing forever all legal rights and obligations of the parent or guardian of the child against whom the order of termination is entered and of the child who is the subject of the petition to that parent or guardian."

Our termination statutes identify "those situations in which the state's interest in the welfare of a child justifies interference with a parent's constitutional rights by setting forth grounds on which termination proceedings can be brought." *In re W.B.*, M2004-00999-COA-R3-PT, 2005 WL 1021618, at *7 (Tenn. Ct. App. Apr. 29, 2005) (citing Tenn. Code Ann. § 36-1-113(g)). To support the termination of parental rights, petitioners must prove both the existence of one of the statutory grounds for termination and that termination is in the child's best interest. Tenn. Code Ann. § 36-1-113(c); *In re D.L.B.*, 118 S.W.3d 360, 367 (Tenn. 2003); *In re Valentine*, 79 S.W.3d 539, 546 (Tenn. 2002).

Because of the fundamental nature of the parent's rights and the grave consequences of the termination of those rights, courts must require a higher standard of proof in deciding termination cases. *Santosky*, 455 U.S. at 769; *In re M.W.A., Jr.*, 980 S.W.2d 620, 622 (Tenn. Ct. App. 1998). Thus, both the grounds for termination and the best interest inquiry must be established by clear and convincing evidence. Tenn. Code Ann. § 36-1-113(c)(1); *In re Valentine*, 79 S.W.3d at 546. Clear and convincing evidence "establishes that the truth of the facts asserted is highly probable, and eliminates any serious or substantial doubt about the correctness of the conclusions drawn from the evidence." *In re M.J.B.*, 140 S.W.3d 643, 653 (Tenn. Ct. App. 2004) (citations omitted). Such evidence "produces in a fact-finder's mind a firm belief or conviction regarding the truth of the facts sought to be established." *Id.*

In light of the heightened standard of proof in these cases, a reviewing court must

adapt the customary standard of review set forth by Tenn. R. App. P. 13(d). *Id.* at 654. As to the trial court's findings of fact, our review is de novo with a presumption of correctness unless the evidence preponderates otherwise, in accordance with Tenn. R. App. P. 13(d). *Id.* We must then determine whether the facts, as found by the trial court or as supported by the preponderance of the evidence, clearly and convincingly establish the elements necessary to terminate parental rights. *Id.*

ANALYSIS

Mother asserts that the trial court's finding of abandonment by failure to support, pursuant to Tenn. Code Ann. § 36-1-102(1)(A)(i), is not supported by clear and convincing evidence. Specifically, she argues that the October 30, 2012 parenting plan did not "make [Mother] aware of a duty to pay child support" and that, as a result, her failure to support was not willful.

Pursuant to Tenn. Code Ann. § 36-1-113(g)(1), abandonment is one of the grounds for termination of parental rights. Tennessee Code Annotated section 36-1-102(1)(A)(i) defines abandonment as the willful failure to visit or willful failure to support, or make reasonable payments toward support, for a period of four consecutive months immediately preceding the filing of the termination petition. A parent's failure to support a child is "willful" when the parent is "aware of his or her duty to visit or support, has the capacity to do so, makes no attempt to do so, and has no justifiable excuse for not doing so." *In re Audrey S.*, 182 S.W.3d 838, 864 (Tenn. Ct. App. 2005). This Court has previously explained that, "the obligation to pay support exists even in the absence of a court order to do so." *Dep't of Children's Servs. v. Culbertson*, 152 S.W.3d 513, 523-24 (Tenn. Ct. App. 2004); *see also* Tenn. Code Ann. § 36-1-102(1)(H) ("Every parent who is eighteen (18) years of age or older is presumed to have knowledge of a parent's legal obligation to support such parent's child or children."); *In re Mark A. L.*, No. M2013-00737-COA-R3-PT, 2013 WL 5536801, at *4 (Tenn. Ct. App. Oct. 4, 2013) (noting that the absence of an order to pay support is not dispositive of the question of whether the failure to pay support is willful).

In this case, the pertinent four month period we must be concerned with is August 13, 2012 to December 13, 2012. The evidence regarding Mother's monetary support of Alex during this time period is undisputed. Mother testified that her DCS caseworker communicated that she was required to pay child support, but she denies that she was aware of the "set amount" she was required to pay.[7] She testified that she did not provide any

---

[7] Specifically, Mother testified:

Q. Now, going back to the permanency plan that we've discussed, you did participate in that

5

monetary support for Alex from August 2012 to December 2012. Mother also acknowledged that she did not provide any items (toys, clothes, shoes, etc.) for Alex during the relevant time period.[8] Regarding her ability to pay support, she testified that she received $2,679 in disability payments each month beginning in January 2012. Her testimony regarding her living expenses indicated that she had money left each month from which she could have paid some support for Alex.

Considering the foregoing and the entire record, it has been clearly and convincingly established that Mother was aware of her duty to support the child, that she had the ability to provide support, and that she willfully failed to do so in the four months preceding the filing of the termination petition. *See* Tenn. Code Ann. § 36-1-102(1)(A)(i). Therefore, we affirm the finding that Mother abandoned the child by failing to support him.

Once a ground for termination has been proven by clear and convincing evidence, the court must then determine whether it is in the best interest of the child for the parent's rights to be terminated. Tennessee Code Annotated section 36-1-113(i) contains a non-exhaustive list of factors a trial court is required to consider in making the best interest determination:

(1) Whether the parent or guardian has made such an adjustment of circumstance, conduct, or conditions as to make it safe and in the child's best interest to be in the home of the parent or guardian;

(2) Whether the parent or guardian has failed to effect a lasting adjustment after reasonable efforts by available social services agencies for such duration of time that lasting adjustment does not reasonably appear possible;

(3) Whether the parent or guardian has maintained regular visitation or other contact with the child;

---

via phone in October of 2012?
A. Yes.
. . .
Q. Okay. Going back to that meeting, to your recollection, what was said or discussed regarding any financial obligation that you had to Alex?
A. It was dated in there, because they read it verbatim on the permanency plan, that me and Mr. [G.] would *take care of Alex financially*.

(Emphasis added).

[8] Mother testified that she purchased clothes, shoes, toys, and a computer prior to the relevant time period, but when asked specifically about August 13, 2012 through December 13, 2012, Mother testified that she did not provide any of these items for Alex during that time.

(4) Whether a meaningful relationship has otherwise been established between the parent or guardian and the child;

(5) The effect a change of caretakers and physical environment is likely to have on the child's emotional, psychological and medical condition;

(6) Whether the parent or guardian, or other person residing with the parent or guardian, has shown brutality, physical, sexual, emotional or psychological abuse, or neglect toward the child, or another child or adult in the family or household;

(7) Whether the physical environment of the parent's or guardian's home is healthy and safe, whether there is criminal activity in the home, or whether there is such use of alcohol, controlled substances or controlled substance analogues as may render the parent or guardian consistently unable to care for the child in a safe and stable manner;

(8) Whether the parent's or guardian's mental and/or emotional status would be detrimental to the child or prevent the parent or guardian from effectively providing safe and stable care and supervision for the child; or

(9) Whether the parent or guardian has paid child support consistent with the child support guidelines promulgated by the department pursuant to § 36-5-101.

Every factor need not be applicable for the trial court to determine it is in the best interest of the child for a parent's rights to be terminated. *See In re Audrey S.*, 182 S.W.3d at 878. The best interest analysis is a fact-intensive inquiry requiring the court to consider the unique facts of the case "from the child's, rather than the parent's, perspective." *In re Giorgianna H.*, 205 S.W.3d 508, 523 (Tenn. Ct. App. 2006).

The trial court made the following findings with respect to the children's best interests:

This court has reviewed [Alex's] case during his custodial stay and realizes that [Alex] is a special needs child and will require a level of care that [Mother] does not appear able or prepared to give. . . . Therefore, the Court finds that termination of the parental rights of [Mother] [is] in the best interest of the minor child . . . for the following reasons:
#1. The Respondent, [Mother], has not made changes to her conduct

7

or circumstances that would make it safe for the child to go home. Specifically, [Mother] has not maintained a home where [Alex] can return home.

#2. The Respondent, [Mother], has not made lasting changes in her lifestyle or conduct after reasonable efforts by the state to help, so that lasting change does not appear possible. Despite the reasonable efforts from the state for a period of nearly thirty-four months, [Mother] is unable to take custody of [Alex].

#3. The Respondent, [Mother], abandoned the child financially having not contributed to [his] support in a consistent and adequate manner without the ability to support the child in her home.

#4. The Respondent, [Mother], has shown little or no interest in the welfare of the child and has abandoned the care of the child to the state.

We agree with the trial court that, in the years since Alex entered DCS custody, Mother has failed to make an adjustment of circumstances in order to make it safe for him to be returned to her. *See* Tenn. Code Ann. § 36-1-113(i)(1). Although Mother completed some of the action steps outlined in the permanency plan, her disappearance in 2012 coupled with her failure to remain in contact with DCS and Alex for extensive periods of time suggests that she is unable or unwilling to be attentive to Alex's needs. Furthermore, Mother has shown little interest in maintaining visitation or other contact with Alex. *See* Tenn. Code Ann. § 36-1-113(i)(3)-(4). Mother testified that she has not physically visited with Alex since April 2012 and had only a "couple" of phone conversations with him during the four months preceding the filing of the petition.

Although not specifically mentioned by the trial court, we feel compelled to point out the disturbing nature of the alleged sexual abuse of Alex by his Mother. *See* Tenn. Code Ann. § 36-1-113(i)(6). In the psychological report entered at trial, Alex's foster mother reported that Alex's behavior regressed after in-person visits with his Mother; for example, Alex would lose bladder and bowel control and have nightmares after having visits with her. Alex reported multiple incidences of inappropriate touching and exhibited "sexually reactive behaviors" targeted toward himself and others; these symptoms were described as being "consistent with sexual abuse." The psychologist stated, "[i]t appears from all the data collected for this evaluation that Alex's mother is a significant trauma trigger for him."

In sum, our review of the evidence as applied to the factors at Tenn. Code Ann. § 36-1-113(i) leads us to conclude that there is clear and convincing evidence to support the trial court's holding that termination of Mother's parental rights is in Alex's best interest.

CONCLUSION

For the forgoing reasons, we affirm the trial court's termination of Mother's parental rights.  Costs of the appeal are assessed against the Mother, for which execution may issue if necessary.

_____

ANDY D. BENNETT, JUDGE